1

2

3

4

5

6

7

8                     UNITED STATES DISTRICT COURT

9                     EASTERN DISTRICT OF CALIFORNIA

10                         ----oo0oo----

11   KRISTY SCHWARM, PATRICIA
     FORONDA, and JOSANN ANCELET,
12   on behalf of themselves and
     others similarly situated,
13                                      NO. CIV. 05-01304 WBS GGH
          Plaintiffs,
14                                      MEMORANDUM AND ORDER RE:
       v.                               MOTIONS FOR SUMMARY
15                                      JUDGMENT

16   HENRY CRAIGHEAD, an individual,
     DISTRICT ATTORNEY TECHNICAL
17   SERVICES, LTD., a Nevada
     Corporation, dba COMPUTER
18   SUPPORT SERVICES, aka CHECK
     RESTITUTION/PROSECUTION PROGRAM,
19   JOHN Q. LAWSON, an individual,
     MARY A. CHASE, an individual,
20   and DOES 1 through 20,
     inclusive,
21
          Defendants.
22

23                         ----oo0oo----

24        Plaintiffs Kristy Schwarm, Patricia Foronda, and Josann

25   Ancelet filed this class action lawsuit against defendants Henry

26   Craighead, District Attorney Technical Services, Ltd. (DATS),

27   John Q. Lawson, and Mary A. Chase based on defendants' collection

28   efforts.  Plaintiffs now move for summary judgment with respect

                                  1

to their claims against Craighead for violations of the Fair Debt

Collection Practices Act (FDCPA), 15 U.S.C. §§ 1692-1692p, and

the procedural due process clauses of the federal and state

Constitutions.  Craighead subsequently filed a cross-motion for

summary judgement with respect to his liability under the FDCPA.

I.  Factual and Procedural Background[1]

In 1985, the California Legislature enacted the Bad

Check Diversion Act (BCDA), Cal. Penal Code §§ 1001.60-1001.67,

"to provide a feasible alternative to criminal prosecution by

offering bad check writers a chance to pay their debts and clear

the incident reports against them without risking criminal

prosecution."  del Campo v. Kennedy, 491 F. Supp. 2d 891, 895

(N.D. Cal. 2006).  After a county authorizes and a district

attorney creates a bad check diversion program, the BCDA permits

the district attorney to contract with a private entity to

"conduct[]" the program.[2]  Cal. Penal Code § 1001.60.

DATS, which also did business as Computer Support

Services (CSS), contracted with twenty-five California district

---

[1]  Craighead did not specifically oppose plaintiffs'
Statement of Undisputed Facts or provide a separate statement as
required by Local Rule 56-260.  E. Dist. of Cal. Local R. 56-260.
Where Craighead's opposition contradicts facts within plaintiffs'
Statement of Undisputed Facts, the court will assume he disputes
those facts.
        Twenty-two days after Craighead filed his reply brief
in support of his motion for summary judgment, plaintiffs
untimely filed six objections.  The court need not address the
objections because it did not rely on any of the objectionable
evidence.

[2]  Craighead is not entitled to sovereign immunity based
its contracts with the district attorneys' offices.  See del
Campo v. Kennedy, 517 F.3d 1070, 1080-81 (9th Cir. 2008) (a
private company contracting with a district attorney's office
pursuant to the BCDA is not entitled to sovereign immunity).

2

attorneys' offices to administer diversion programs pursuant to
the BCDA.[3]  (Pls.' Stmt. of Undisputed Facts # 59.)  DATS'
written contracts with the district attorneys' offices
established that DATS would "provide services[] as an independent
contractor" to the district attorneys' offices in accordance with
the BCDA.  (Arons Decl. Exs. 19-22.)  The contracts also
established the percent of the collected fees the district
attorneys' offices would receive, whether the particular office
was guaranteed a monthly minimum remittance, and that DATS had to
indemnify a respective district attorney's office for DATS'
actions made pursuant to the contract.  (Id.)

        Craighead was the founder and chief executive officer
of DATS.  (Arons Decl. Ex. 2 (Craighead's Resp. to Pls.'
Interrog. ## 1-2).)  He also served as its president from April
14, 1998 through April 17, 2004 and was one of the three members
of DATS' Board of Directors, which exercised final authority over
DATS' procedures and policies.  (Id.; Craighead Dep. 11:2-7.)  In
1980, Craighead also designed the automated software program DATS
used to generate collection letters and track activity.
(Craighead Dep. 144:10-11.)  For the entire duration of DATS'
operations in California, Craighead independently managed and
maintained that program and DATS' computer system.  (Id. at
20:19-25.)  Craighead was also responsible for DATS' marketing
and independently negotiated its contracts with district
attorneys' offices.  (Id. at 20:12-13, 140:10-12.)  He also

---

[3]     Craighead alleges that, DATS has terminated its
operations and no longer operates bad check diversion programs
with district attorneys' offices.  (Craighead's Mem. in Opp'n to
Pls.' Mot. for Summ. J. 13:13-19.)

oversaw coordination of DATS' diversion classes, distributed
monthly payments to the district attorneys' offices, accessed the
post office box to which check writers mailed payments, and acted
as a signatory for the bank account in which DATS deposited check
writers' payments. (Pls.' Stmt. of Undisputed Facts ## 25, 28-
30.) Craighead also "regularly interface[d] with clients,
victims, and check writers" to accomplish DATS' collection
efforts. (Arons Decl. Ex. 2 (Craighead's Resp. to Pls.'
Interrog. # 1).)

To initiate its collection efforts, DATS followed
uniform practices and procedures throughout the state. (Pls.'
Stmt. of Undisputed Facts # 33.) After contracting with a
district attorney, DATS established working relationships in
which local merchants and Certegy, a check guarantee company,
would send bad checks to DATS for collection. (Craighead Dep.
157:1-6.) To participate in a diversion program, a local
merchant had to sign a memorandum of understanding, which
required the merchant to complete a "Request for Complaint" form
in order to submit a bad check to DATS. (Pls.' Stmt. of
Undisputed Facts # 36.) The memorandum of understanding also had
a line for the merchant to indicate the amount its bank charged
for a returned check. (Arons Decl. Ex. 23; Craighead Dep. 101:3-
4.) Upon submitting a check to DATS, the local merchant could
not pursue independent collection efforts or accept a payment
from the check writer. (Arons Decl. Ex. 23.)

When a merchant referred a dishonored check to DATS, it
would be entered into DATS' computer system. (Craighead Dep.
28:21-23.) Each week, DATS sent a report of newly entered checks

to the appropriate district attorney's office.  (<u>Id.</u> at 39:8-18.)
According to Craighead, it was "very rare" for the respective
district attorney's office not to respond to each weekly check
entry report.  (<u>Id.</u> at 39:14-18.)  If an office did not respond,
Craighead states that DATS contacted the office via telephone and
obtained a verbal response from the district attorney's office.
(<u>Id.</u> at 39:17-18, 23-24.)  While the content of a district
attorney's office's "response" is unclear,[4] Craighead alleges
that DATS "never initiate[d] recovery activity prior to getting
some response from a district attorney concerning the check entry
report."  (<u>Id.</u> at 39:19-22.)  Somewhat conflicting with his
deposition testimony, however, is a cover letter that accompanied
a weekly report dated August 23, 2005 in which Craighead stated:
"If we have not received a response from your office by September
1, 2005 we will believe that you have reviewed the listing and
found no one who is not eligible for the Restitution/Diversion
Program and we will proceed with your prescribed restitution
procedures."  (Arons Decl. Ex. 28.)

     Unless a district attorney's office instructed DATS to
stop processing a particular check or a merchant requested DATS
to terminate its efforts, DATS' computerized system began issuing
a series of form collection letters ten days after DATS entered a
check into its system.  (Craighead Dep. 48:4-18, 49:19-22; <u>see</u>
<u>also</u> Arons Decl. Ex. 2 at 17 (indicating that Craighead did "not
personally send program letters to check writers").)  Although

---

      [4]    Craighead only submitted a response letter dated March
10, 2006, which is after plaintiffs filed this lawsuit and the
class period closed.  (Craighead Decl. in Supp. of Mot. for Summ.
J. Ex. 2.)

the respective district attorney's offices did not review each
letter before DATS mailed it, DATS did not draft any of its
letters and all were "drafted or approved by a district
attorney's office." (Craighead Dep. 40:20-25, 46:15-17, 52:19-
22.)  DATS also provided its form collection letters to each
district attorney's office prior to entering into a contract with
the office.  (Id. at 45:15-17.)

        To begin its collection efforts for all of the bad
checks it received, DATS used the same three-letter series, which
it sent in a pre-determined sequence at pre-programmed intervals.
(Pls.' Stmt. of Undisputed Facts # 41.)  The four lines of the
letterhead for each letter includes: 1) the name and title of the
county district attorney for the particular county; 2) the county
name; 3) "Check Restitution/Prosecution Program"; and 4) a phone
number with a 916 area code, which was DATS' phone number.[5]
(Arons Decl. Exs. 2-12, 16.)  The signature line indicates that
each letter was sent by either the "Program Administrator" or
"Administrator." (Id. Exs. 2-13, 16.)  Some of the letters also
indicate the name of the Program Administrator and that the
Administrator is part of the "Bad Check Unit." (Id.)  The
letters instructed the check writers to send payments to the Bad
or NSF Check Program's P.O. Box in Fair Oaks, California, which
was DATS' P.O. Box.  (Id.)  The letters neither reference DATS or
CSS nor state that the district attorney's office did not send
the letters.  (Id.)

───────────────

        [5]   Of the twelve letters plaintiffs submitted, the only
letter with a different letterhead is Exhibit 13, which replaced
the District Attorney's name and title with that of the county's
Chief of Police.  (Arons Decl. Ex. 13.)

In DATS' "First Notice," the check writer was told that a "Complaint has been submitted accusing you of a violation of Penal Code Section 476a (Passing a worthless check) by" the listed complainant and that "[t]his office is currently investigating this complaint." (Arons Decl. Ex. 3.)  "To suspend this criminal investigation," the letter demanded payment of 1) the check amount, 2) a $35.00 "bad check fee," 3) an $85.00 "diversion fee," and 4) a bank fee of up to $10.00. (<u>Id.</u>)  The letter gave the check writer the opportunity to avoid the $85.00 diversion fee and waive "MANDATORY attendance at a financial management class" by paying the total amount due within fifteen days. (<u>Id.</u> (emphasis in original).)  The letter also warned the recipient that failure to respond would "be considered a rejection of this diversion opportunity and may result in further investigation with the possible issuance of a criminal complaint and ARREST warrant." (<u>Id</u>. (emphasis in original).)  The letter also included the following FDCPA-required language: "As required by 15 USC 1692e, Subdivision 11 of the FDCPA we are providing the following statement; [sic] This is an attempt to collect a debt and any information obtained will be used for that purpose." (<u>Id.</u>)

If the check writer did not pay within fifteen days, DATS' computer system generated a second letter on red paper with the title "FINAL NOTICE PRIOR TO REFERRAL FOR POSSIBLE ARREST WARRANT." (Arons Decl. Ex. 4 (emphasis in original); Craighead Dep. 46:3-6.)  In this letter, the recipient was told that failure to pay the check and all fees "will result in your case being reviewed for possible criminal prosecution." (Arons Decl.

7

1   Ex. 4.)

2         If the check writer did not pay within fifteen days of

3   the second letter, DATS "determine[d] if [the check writer] fit

4   [the respective] county's guidelines for prosecution."

5   (Craighead Dep. 49:2-7.)  While the guidelines for each county

6   varied, they all indicated the statutory amounts for misdemeanors

7   and felonies, required a minimum number of months remaining

8   before the statute of limitations expired, and required a minimum

9   level of identification of the check writer.  (Arons Decl. Ex. 27

10  (DATS' pre-prosecution review guidelines for each county).)  If

11  the check did not fit the county's prosecution guidelines, DATS

12  returned the check to the merchant.  (Craighead Dep. 50:16.)

13        If DATS determined that the check writer fit the

14  county's prosecution guidelines, DATS sent a third letter.

15  (Pls.' Stmt. of Undisputed Facts # 48.)  That letter states:

16

17         You have been sent a series of letters giving you
       the opportunity to avoid possible criminal prosecution,
18     as offered by the District Attorney through California
       Penal Code 1001.60 et al.  We have attempted to work with
19     you directly by phone and/or mail in resolving this
       serious criminal complaint submitted against you by the
20     victim without success.
           You have not co-operated with our efforts and this
21     letter is your notification that your banking account
       records will be ordered and upon receipt, your file will
22     be sent to the District Attorneys [sic] office for review
       and the possible issuance of an arrest warrant for
23     passing worthless checks under California Penal Code
       [section] 476a, depending upon the results of their
24     investigation.
           If you wish to avoid this action with the
25     possibility of being arrested and having a criminal
       record by paying ALL of the amounts that you have due and
26     outstanding, you must call the District Attorney's Bad
       Check program immediately . . . to place a stay on
27     further criminal complaint processing [and pay in full].
       . . . Any further contact with you will be directly from
28     the District Attorney's Criminal Division Prosecution
       Unit.

                                8

1  (Arons Decl. Ex. 5.)  If the check writer did not pay after the

2  third letter, DATS' procedure was to request the individual's

3  bank records and send the check, DATS' records, and any bank

4  records to the local district attorney's office.  (Craighead Dep.

5  184:3-16.)  (But see id. at 184:10-25 (indicating that, for a

6  reason unknown to Craighead, DATS requested Schwarm's bank

7  records seven months after DATS' procedure suggested they should

8  have been requested).)

9          Depending on the circumstances of a particular check

10 writer's case, DATS also sent a variety of additional form

11 letters to check writers that included similar statements as in

12 its first three letters.  (Arons Decl. Exs. 6-12, 16; Craighead

13 Dep. 51:9-14.)  For example, DATS had form letters if a check

14 writer did not remit the full amount, DATS received two bad

15 checks written by the same person, or DATS did not receive a

16 promised payment.  (Arons Decl. Exs. 9, 12.)  DATS' employees

17 also contacted check writers via telephone and allegedly followed

18 a training script on such calls.  (Craighead Dep. 157:12-25; see

19 also id. (indicating that Craighead did not help create the

20 script).)

21          For check writers who did not pay within fifteen days

22 of the date of the first letter, DATS generally required the

23 check writer to pay the $85.00 diversion fee and attend a

24 diversion class that focused on financial management.  (Arons

25 Decl. Exs. 9, 12.)  Diversion classes were held in each county

26 whenever there were thirty-five people eligible to take the

27 class.  (Craighead Dep. 77:9-24.)  When DATS sent a letter

28 requiring a check writer to attend a diversion class, its

computer system coded that check writer as having attended the
class.  If the check writer did not attend the class, DATS
manually changed the code to reflect the individuals's non-
attendance and rescheduled the individual for the next class.
(Id. at 78-82.)

Beginning in July 2004, plaintiff Kristy Schwarm began
receiving demand letters from DATS' "Check Restitution/
Prosecution Program" for Mendocino County regarding two
dishonored checks Schwarm wrote to Walmart and SaveMart for food
and family goods.  (Schwarm Decl. ¶¶ 3-4.)  Between June 30, 2004
and May 11, 2005, DATS sent Schwarm the first three form letters
described above and six additional letters, including one with
the Mendocino Chief of Police listed in the letterhead.  (Id. at
¶¶ 5, 7, 10.)  DATS sent some of the letters after the one-year
statute of limitations for misdemeanor bad check writing had
passed and, after Schwarm filed bankruptcy, DATS sent her a
letter informing her that "[b]ankruptcy cannot provide a shield
or be used to cloak a crime when criminal sanctions are pending."
(Pls.' Stmt. of Undisputed Facts # 9; Schwarm Decl. ¶ 10; Arons
Decl. Ex. 13.)  In its letters, DATS sought to collect a $10.00
bank fee for Schwarm's check to Walmart and a $5.00 bank fee for
her check to SaveMart.  (Arons Decl. Exs. 3-4.)  Plaintiffs
allege, however, that Walmart does not pay a bank fee for
returned checks and that SaveMart's fee is only $0.55 per check.
(Id. Ex. 29 at ¶ 8; Kline Dep. 13:13-24.)  Schwarm did not learn
that DATS, not the district attorney's office, sent the letters
until she consulted a bankruptcy attorney in 2005.  (Schwarm
Decl. ¶¶ 6, 8.)

1    In December 2003, Plaintiff Patricia Foronda received

2 DATS' First Notice from the "Madera County Check

3 Restitution/Prosecution Program" based on a check she wrote to

4 Rosenbalm Rockery for household supplies. (Foronda Decl. ¶ 10.)

5 When Foronda contacted DATS at the number listed on the letter,

6 she believed she was speaking with an employee of the district

7 attorney's office and that she had to pay the amount requested to

8 avoid arrest. (<u>Id.</u> at ¶ 2.) Although she paid the fees,

9 including the $85.00 diversion fee, she did not attend the

10 diversion class and was never pressured to do so. (<u>Id.</u>)

11    Plaintiff Josann Ancelet began receiving letters from

12 DATS in October 2004 after she wrote a dishonored check to Target

13 for household supplies. (Ancelet Decl. ¶ 1.) When Ancelet

14 contacted DATS at the number listed on its letter and asked if

15 she had contacted the district attorney's office, a DATS employee

16 allegedly answered affirmatively. (<u>Id.</u> at ¶ 2.) Ancelet could

17 not pay the full amount demanded at that time and was charged an

18 additional $25.00 fee to pay in installments. (<u>Id.</u> at ¶ 3.)

19 After paying the amount of the check and all requested fees, DATS

20 also sent Ancelet a letter requiring her to attend a diversion

21 class. (<u>Id.</u> at ¶ 4.) She did not attend the class and was never

22 pressured to do so. (<u>Id.</u>)

23    On June 29, 2005, Schwarm filed a complaint, on behalf

24 of herself and others similarly situated, alleging claims for 1)

25 violations of the FDCPA; 2) violations of the Civil Rights Act,

26 42 U.S.C. § 1983, based on alleged procedural due process

27 violations; 3) state constitutional procedural due process

28 violations; 4) fraudulent misrepresentation; and 5) negligent

11

1  misrepresentation.

2        On March 4, 2006, this court certified the case as a

3  class action for "[a]ll persons who wrote checks in California to

4  whom DATS mailed collection demands concerning dishonored checks,

5  since June 29, 2003" and up until the date of the court's Class

6  Certification Order. (Mar. 4, 2006 Order 20.)[6]  The court named

7  Schwarm as the class representative and subsequently granted

8  plaintiff's motion to add plaintiffs Ancelet and Foronda as class

9  representatives.[7]  (May 25, 2007 Order 5.)

10        After DATS filed Chapter 7 bankruptcy, this action was

11  automatically stayed on August 18, 2006 pursuant to 11 U.S.C. §

12  362(a).  On September 20, 2006, this court lifted the stay as to

13  Craighead only.[8]  (Sept. 20, 2006 Order 1.)

14        Plaintiffs now move for partial summary judgment,

15  requesting: 1) a determination that Craighead is personally

16  liable under the FDCPA; 2) class-wide declaratory relief that

17  Craighead violated the FDCPA; 3) class-wide declaratory relief

18

19       [6]   The court also certified the following subclasses: "(1)

20  all members of the umbrella class, from whom DATS attempted to
collect, or collected money for checks written for personal,

21  family, or household purposes, since June 29, 2004; and (2) all
members of the umbrella class from whom [defendants] attempted to

22  collect, or collected money, since June 29, 2003."  (Id.)

23       [7]   Schwarm sought to add Ancelet and Foronda as plaintiffs
because, unlike Schwarm, they both paid fees demanded by

24  defendants and thus had objectively verifiable damages.  (Mot.
for Leave to Amend Compl. 5.)

25

26       [8]   Because the action remains stayed against the remaining
defendants, the court cannot enter an order that would
detrimentally affect those defendants.  Dean v. Trans World

27  Airlines, Inc., 72 F.3d 754, 756 (9th Cir. 1995).   This Order,
therefore, is not the law of the case with regard to the

28  remaining defendants potential liability and does not have a
preclusive effect against them.

1  that Craighead violated class members' federal (via 42 U.S.C. §
2  1983) and state procedural due process rights; and 4) a
3  determination of the amount of actual and statutory damages.
4  Subsequent to oral argument on plaintiffs' motion for summary
5  judgment, Craighead filed a cross-motion for summary judgment
6  with respect to his liability under the FDCPA.

7  II.  <u>Discussion</u>

8      Summary judgment is proper "if the pleadings, the
9  discovery and disclosure materials on file, and any affidavits
10 show that there is no genuine issue as to any material fact and
11 that the movant is entitled to judgment as a matter of law."
12 Fed. R. Civ. P. 56(c).  A material fact is one that could affect
13 the outcome of the suit, and a genuine issue is one that could
14 permit a reasonable jury to enter a verdict in the non-moving
15 party's favor.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242,
16 248 (1986).  The party moving for summary judgment bears the
17 initial burden of establishing the absence of a genuine issue of
18 material fact and can satisfy this burden by presenting evidence
19 that negates an essential element of the non-moving party's case.
20 <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).
21 Alternatively, the movant can demonstrate that the non-moving
22 party cannot provide evidence to support an essential element
23 upon which it will bear the burden of proof at trial.  <u>Id.</u>

24     Once the moving party meets its initial burden, the
25 non-moving party "may not rely merely on allegations or denials
26 in its own pleading," but must go beyond the pleadings and "by
27 affidavits or as otherwise provided in [Rule 56,] set out
28 specific facts showing a genuine issue for trial."  Fed. R. Civ.

13

1  P. 56(e); <u>Celotex Corp.</u>, 477 U.S. at 324; <u>Valandingham v.</u>

2  <u>Bojorquez</u>, 866 F.2d 1135, 1137 (9th Cir. 1989).

3        In its inquiry, the court must view any inferences

4  drawn from the underlying facts in the light most favorable to

5  the party opposing the motion.  <u>Matsushita Elec. Indus. Co. v.</u>

6  <u>Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).  The court cannot

7  engage in credibility determinations or weigh the evidence

8  because these functions are reserved for the jury.  <u>Anderson</u>, 477

9  U.S. at 255.

10       A.   <u>FDCPA</u>

11       In 1977, Congress enacted the FDCPA "to eliminate

12  abusive debt collection practices by debt collectors, to insure

13  that those debt collectors who refrain from using abusive debt

14  collection practices are not competitively disadvantaged, and to

15  promote consistent State action to protect consumers against debt

16  collection abuses."  15 U.S.C. § 1692(e).  The Act establishes a

17  nonexclusive list of unlawful debt collection practices and

18  provides for public and private remedies.  <u>Id.</u> §§ 1692-1692p.

19       1.   <u>Exceptions to FDCPA Coverage</u>

20       Effective October 13, 2006, Congress exempted

21  qualifying private entities that contract with district attorneys

22  to operate "bad check enforcement programs" from FDCPA liability.

23  <u>Id.</u> § 1692p.  Because DATS allegedly operated as such an entity

24  prior to the effective date of the statute, Craighead can rely on

25  the exemption only if § 1692p is subject to retroactive

26  application.

27       When, as with § 1692p, Congress did not expressly

28  prescribe a statute's proper temporal reach, "the court must

determine whether the new statute would have retroactive effect, i.e. whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." Landgraf v. USI Film Prods., 511 U.S. 244, 280 (1994).  If a statute has a retroactive effect, the "traditional presumption teaches that [the statute] does not govern absent clear congressional intent favoring such a result."  Id. at 280.

To determine whether a statute has a retroactive effect, "the court must ask whether the new provision attaches new legal consequences to events completed before its enactment." Id. at 269-70.  The Ninth Circuit has explained that, under the Landgraf test, a statute has a retroactive effect if it "[t]ak[es] away a plaintiff's right to a remedy."  Scott v. Boos, 215 F.3d 940, 947 (9th Cir. 2000).

Here, because applying § 1692p retroactively would potentially preclude plaintiffs from seeking relief under the FDCPA, the court finds that the statute has a retroactive effect. See Dobbs v. Anthem Blue Cross & Blue Shield, No. 04-02283, 2007 WL 2439310, at *3 (D. Colo. Aug. 23, 2007) (finding a statute that enacted a new ERISA plan exemption had a retroactive effect because applying it retroactively "would materially alter the rights, duties, and liabilities of the parties").

Because § 1692p has a retroactive effect, it cannot exempt DATS unless there is a "clear congressional intent favoring such a result."  Landgraf, 511 U.S. at 280.  With § 1692p, defendant cannot overcome the presumption against retroactive application of statutes because neither the statute

15

nor its brief legislative history suggest that Congress intended the statute to apply retroactively.  15 U.S.C. § 1692p; S. Rep. No. 109-256, at 12 (2006), <u>reprinted in</u> 2006 U.S.C.C.A.N. 1219, 1231-32.  Therefore, Craighead cannot rely on § 1692p to exempt DATS from the FDCPA.[9]

Section 1692a(6)(C) of the FDCPA also exempts "any officer or employee of . . . any State to the extent that collecting or attempting to collect any debt is in the performance of his official duties."  15 U.S.C. § 1692a(6)(C). This section exempts only "officers" or "employees," thus does not apply to private organizations that operate via a contract with the government.  <u>Brannan v. United Student Aid Funds, Inc.</u>, 94 F.3d 1260, 1263 (9th Cir. 1996).  Craighead, therefore, is not exempt from the FDCPA based on DATS' contract with the district attorneys' offices to operate pursuant to the BCDP.

2.   <u>Personal Liability Under the FDCPA</u>

To be liable under the FDCPA, a defendant must qualify as a "debt collector," which § 1692a defines as "any person who uses any instrumentality of interstate commerce . . . in any business the principal purpose of which is the collection of any

---

[9]   Even if Congress intended for § 1692p to apply retroactively, Craighead still could not avoid liability under the FDCPA pursuant to that section.  To seek safe harbor under § 1692p, the private entity operating the bad check enforcement program must have complied with the state penal code sections that provide for such a program and collected checks only after a district attorney found "probable cause of a [criminal] bad check violation."  15 U.S.C. § 1692p(c)(i), (c)(iv)(I).  As discussed below, DATS did not comply with all of the BCDA provisions and there is a genuine issue of material fact as to whether a district attorney made the requisite probable cause determination.

debts,[10] or who regularly collects or attempts to collect,

directly or indirectly, debts owed or due or asserted to be owed

or due another." 15 U.S.C. § 1692a(6).  The Staff Commentary on

the FDCPA[11] explains that this definition includes "[e]mployees

of a debt collection business, including a corporation,

partnership, or other entity whose business is the collection of

debts owed another."[12]  53 Fed. Reg. 50102 (Dec. 13, 1998).

When an employee of a debt collection corporation is

also a shareholder, officer, or director of that corporation,

---

[10]    "[A] dishonored check is a 'debt' within the meaning of
the FDCPA."  Charles v. Lundgren & Assocs., P.C., 119 F.3d 739,
742 (9th Cir. 1997) (adopting the reasoning of Omnitech Int'l,
Inc. v. Clorox Co., 11 F.3d 1316 (7th Cir. 1994)); see also 15
U.S.C. § 1692a(5) (defining "debt" for purposes of the FDCPA).
Therefore, plaintiffs' dishonored checks, which were written for
personal, family, or household purposes as the FDCPA requires,
constitute debts for purposes of the FDCPA.  Charles, 119 F.3d at
742; see also 15 U.S.C. § 1692a(5) (defining "debt" for purposes
of the FDCPA to include only an "obligation[s that] . . . are
primarily for personal, family, or household purposes"); (Schwarm
Decl. ¶ 3; Foronda Decl. ¶ 1; Ancelet Decl. ¶ 1).

[11]    A court "'must give substantial deference to an
agency's interpretation of its own regulations.'"  Brannan v.
United Student Aid Funds, Inc., 94 F.3d 1260, 1263 (9th Cir.
1996) (quoting Thomas Jefferson Univ. v. Shalala, 512 U.S. 504,
512 (1994)).  The court's "'task is not to decide which among
several competing interpretations best serves the regulatory
purpose.  Rather, the agency's interpretation must be given
"controlling weight unless it is plainly erroneous or
inconsistent with the regulation."'"  Id.

[12]    Craighead does not dispute that DATS constitutes a
"debt collection business."  Craighead does argue that DATS is
not subject to the FDCPA because it allegedly operated pursuant
to criminal, not civil, state law.  (Craighead's Mem. in Opp'n to
Pls.' Mot. for Summ. J. 2:21-27, 7:4-7.)  Besides the exception
in § 1692p, however, the FDCPA does not distinguish whether a
debt collection business operated pursuant to criminal or civil
law.  Therefore, DATS was a "business the principal purpose of
which is the collection of . . . debts" as the FDCPA requires.
15 U.S.C. 1692a(6); del Campo v. Kennedy, 491 F. Supp. 2d 891,
903 (N.D. Cal. 2006) (holding that a private entity operating a
bad check diversion program pursuant to a contract with the
county district attorney is subject to the FDCPA).

there is a split of authority about whether the corporate form

insulates the shareholder, officer, or director from personal

liability under the FDCPA.  Specifically, the Sixth Circuit and

most district courts that have addressed the issue have held that

the corporate structure does not insulate shareholders, officers,

or directors from personal liability under the FDCPA.  Kistner v.

Law Offices of Michael P. Margelefsky, L.L.C., 518 F.3d 433, 437-

38 (6th Cir. 2008); del Campo v. Kennedy, 491 F. Supp. 2d 891,

903 (N.D. Cal. 2006);  Brumbelow v. Law Offices of Bennett &

Deloney, P.C., 372 F. Supp. 2d 615, 618-21 (D. Utah 2005);

Albanese v. Portnoff Law Assocs., Ltd., 301 F. Supp. 2d 389, 400

(E.D. Pa. 2004); Musso v. Seiders, 194 F.R.D. 43, 46-47 (D. Conn.

1999); Brink v. First Credit Res., 57 F. Supp. 2d 848, 861-62 (D.

Ariz. 1999); Pikes v. Riddle, 38 F. Supp. 2d 639, 640 (N.D. Ill.

1998); Ditty v. Checkrite, Ltd., 973 F. Supp. 1320, 1337-38 (D.

Utah 1997); Newman v. Checkrite Cal., Inc., 912 F. Supp. 1354,

1372 (E.D. Cal. 1995); Teng v. Metro. Retail Recovery Inc., 851

F. Supp. 61, 67 (E.D. N.Y. 1994).

On the other hand, the Seventh Circuit has held that,

regardless of an individual's personal involvement with the

corporation's debt collecting activities, a shareholder or

officer of a debt collecting corporation cannot be personally

liable unless the plaintiff pierces the corporate veil.  White v.

Goodman, 200 F.3d 1016, 1019 (7th Cir. 2000) (concluding that the

corporate form protects shareholders from personal liability and

that, in naming them, plaintiffs "should have been sanctioned for

what amounts to malicious prosecution"); Pettit v. Retrieval

Masters Creditor Bureau, Inc., 211 F.3d 1057, 1059 (7th Cir.

1  2000) ("[U]nder . . . <u>White v. Goodman</u>, the extent of control

2  exercised by an officer or shareholder is irrelevant to

3  determining his liability under the FDCPA."); <u>see also</u> <u>Ernst v.</u>

4  <u>Jesse L. Riddle, P.C.</u>, 964 F. Supp. 213, 216 (M.D. La. 1997)

5  (noting that the FDCPA lacks language suggesting that "Congress

6  intended the act to supplant state corporate law which generally

7  limits then liability of a corporation's shareholders, officers,

8  and directors . . .").

9          While the Ninth Circuit has not yet addressed the

10  issue, this court will adhere to the conclusion reached by the

11  Sixth Circuit and the majority of district courts because it is

12  more consistent with the FDCPA's broad language.  The FDCPA

13  expressly prohibits certain acts by "<u>any</u> person . . . in <u>any</u>

14  business."  15 U.S.C. § 1692a(6) (emphasis added).  Without

15  distinguishing between an employee's position within the

16  corporation, the Staff Commentary also explains that "any person"

17  includes an "employee of a <u>corporation</u>."  53 Fed. Reg. 50102

18  (Dec. 13, 1998) (emphasis added).  As the <u>Brumbelow</u> court

19  explained, "[w]here Congress has chosen to use broad language,

20  that language should be given its full effect no matter how

21  sweeping."  372 F. Supp. 2d at 619; <u>accord</u> <u>Pikes v. Riddle</u>, 38 F.

22  Supp. 2d 639, 640 (N.D. Ill. 1998) ("[I]t is highly unlikely that

23  Congress wished to restrict liability to the often small

24  corporate vehicle used for collection, and the statutory language

25  clearly brings all those personally involved within the ambit of

26  'debt collector.'").

27          Moreover, in holding that a shareholder or officer

28  cannot be personally liable unless the plaintiff pierces the

1   corporate veil, the Seventh Circuit heavily relied on its analogy
2   to Title VII and concluded that, similar to Title VII, the FDCPA
3   imposes vicarious, not personal, liability.  <u>Pettit</u>, 211 F.3d at
4   1059.  Title VII, however, lacks the broad language Congress used
5   in the FDCPA.  Unlike the FDCPA's expansive coverage including
6   "any person in . . . any corporation," 15 U.S.C. § 1692a(6),
7   Title VII applies only to a "covered entity," which it defines as
8   "an employer, employment agency, labor organization, or joint-
9   labor management committee."  42 U.S.C. § 12111(2); <u>Brumbelow</u>,
10  372 F. Supp. 2d at 621-22; <u>accord</u> <u>Kistner v. Law Offices of</u>
11  <u>Michael P. Margelefsky, L.L.C.</u>, 518 F.3d 433, 437
12  (6th Cir. 2008).  Contrary to the Seventh Circuit's reasoning,
13  therefore, Congress' conspicuous inclusion of "any person" in the
14  FDCPA and exclusion of such language from Title VII strengthens
15  the conclusion that Congress intended that "any person" could be
16  liable under the FDCPA regardless of the protections state
17  corporate law affords.

18          This conclusion is also consistent with circuit court
19  decisions imposing personal liability on corporate shareholders,
20  officers, and directors under the Comprehensive Environmental
21  Response, Compensation, and Liability Act of 1980 (CERCLA), 42
22  U.S.C. §§ 6901-9675.  Assuming the statutory conditions are
23  satisfied, CERCLA allows the United States to seek reimbursement
24  for cleanup efforts from "any person who at the time of disposal
25  of any hazardous substance owned or operated any facility."
26  <u>United States v. Bestfoods</u>, 524 U.S. 51, 55-56 (1998) (citations
27  omitted).  CERCLA also defines "owner or operator" to include
28  "any person" and defines "person" to include "an individual."  42

1  U.S.C. § 9601(20)(A), (21).

2         Because "Congress could have limited the statutory
3  definition of 'person' [to exclude corporate shareholders and
4  officers,] but chose not to," every circuit court that has
5  addressed the issue has held that CERCLA imposes personal
6  liability on shareholders, officers, and directors without
7  requiring a plaintiff to pierce the corporate veil.  U.S. v. Ne.
8  Pharm. & Chem. Co., 810 F.2d 726, 743-46 (8th Cir. 1986); accord;
9  Carter-Jones Lumber Co. v. Dixie Distrib. Co., 166 F.3d 840, 846-
10 47 (6th Cir. 1999); Bedford Affiliates v. Sills, 156 F.3d 416,
11 431 (2d Cir. 1998); Sidney S. Arst Co. v. Pipefitters Welfare
12 Educ. Fund, 25 F.3d 417, 420 (7th Cir. 1994); Witco Corp. v.
13 Beekhuis, 38 F.3d 682, 962 (3d Cir. 1994); Riverside Market Dev.
14 Corp. v. Int'l Bldg. Prods., Inc., 931 F.2d 327, 330 (5th Cir.
15 1991).

16        The Supreme Court has similarly relied on CERCLA's
17 expansive language in holding that "a corporate parent that
18 actively participated in and exercised control over, the
19 operations of [a polluting] facility itself may be held directly
20 liable in its own right as an operator of the facility."
21 Bestfoods, 524 U.S. at 55, 64-66.  The Court explained that,
22 "[u]nder the plain language of the statute, any person who
23 operates a polluting facility is directly liable for the costs of
24 cleaning up the pollution . . . regardless of whether that person
25 is the facility's owner."  Id. (citation omitted).

26        Therefore, consistent with the district courts in this
27 circuit that have addressed personal liability under the FDCPA
28 and precedent addressing personal liability under CERCLA, this

court concludes that a shareholder, officer, or director of a
debt-collecting corporation may be held personally liable for
FDCPA violations regardless of whether the plaintiff can pierce
the corporate veil.[13]

Nonetheless, because the FDCPA imposes personal, not
derivative, liability, serving as a shareholder, officer, or
director of a debt collecting corporation is not, in itself,
sufficient to hold an individual liable as a "debt collector."
Regardless of the employee's rank within the company, § 1692a(6)
requires that the individual "regularly collect[ed] or
attempt[ed] to collect, directly or indirectly, debts owed or due
or asserted to be owed or due another."  15 U.S.C. § 1692a(6).
Based on this requirement, courts have found an individual
personally liable if the individual 1) materially participated in
collecting the debt at issue, del Campo v. Kennedy, 491 F. Supp.

---

[13]   Craighead attempts to distinguish the cases that found
a shareholder or officer of a debt collecting corporation
personally liable because, in most of the cases, the defendant
debt collectors were attorneys.  Craighead correctly notes that
courts have emphasized that a defendant was an attorney when
determining whether the defendant violated the FDCPA because
"[a]buses by attorney debt collectors are more egregious than
those of lay collectors."  Irwin v. Mascott, 112 F. Supp. 2d 937,
948 (N.D. Cal. 2000); see also Guerrero v. RJM Acquisitions
L.L.C., 499 F.3d 926, 935 (9th Cir. 2007) ("The statute as a
whole thus suggests a congressional understanding that, when it
comes to debt collection matters, lawyers and their debtor
clients will be treated differently. . . . Congress did not view
attorneys as susceptible to the abuses that spurred the need for
the legislation to begin with, and . . . Congress built that
differentiation into the statute itself.") (citations omitted).
(Craighead's Mem. in Opp'n to Pls.' Mot. for Summ. J. 8, 10:17-
28.)
None of the cases, however, relied on a defendant's
status as an attorney when determining whether the defendant
could be personally liable under the FDCPA.  The court,
therefore, is unpersuaded that the line of cases finding personal
liability without piercing the corporate veil is limited to
attorney shareholders, officers, or directors.

1  2d 891, 903 (N.D. Cal. 2006); <u>Brink v. First Credit Res.</u>, 57 F.

2  Supp. 2d 848, 862 (D. Ariz. 1999); 2) "exercise[d] control over

3  the affairs of [the] business, <u>Piper v. Portnoff Law Assocs.</u>, 274

4  F. Supp. 2d 681, 689-90; 3) was "personally involved in the

5  collection of the debt at issue," <u>Musso v. Seiders</u>, 194 F.R.D.

6  43, 46 (D. Conn. 1999); or 4) "was 'regularly engaged, directly

7  and indirectly, in the collection of debts.'"  <u>Kistner v. Law</u>

8  <u>Offices of Michael P. Margelefsky, L.L.C.</u>, 518 F.3d 433, 438 (6th

9  Cir. 2008) (quoting <u>Ditty v. CheckRite, Ltd.</u>, 973 F. Supp. 1320,

10  1337 (D. Utah 1997)).

11           Under any of the aforementioned standards, the

12  undisputed facts show that Craighead "regularly collect[ed] or

13  attempt[ed] to collect, directly or indirectly, debts owed or due

14  or asserted to be owed or due another." 15 U.S.C. § 1692b(6).

15  DATS' collection activities at dispute in this case were its sole

16  source of income, therefore, as a director and president, the

17  only profit-generating activity Craighead oversaw was collecting

18  debts pursuant to contracts with the district attorneys' offices.

19  While Craighead allegedly did not draft the form collection

20  letters DATS used, he was one of only three individuals that had

21  final authority over DATS' collection procedures, which relied on

22  the form letters.  (Craighead Dep. 11:2-8); <u>see also</u> <u>Albanese v.</u>

23  <u>Portnoff Law Assocs., Ltd.</u>, 301 F. Supp. 2d 389, 400 (E.D. Pa.

24  2004) ("[T]he President . . . whose duties include supervising

25  the staff and the overall operations of the firm, occupies the

26  precise position that the <u>Pollice</u> court held was exposed to

27  individual FDCPA liability . . . .").  Craighead also developed

28  the automated software DATS used and was solely responsible for

23

1  managing and maintaining the automated computer system that
2  implemented DATS' collection program.  (Craighead Dep. 20:19-25.)

3        DATS also relied exclusively on Craighead to form
4  relationships with merchants, negotiate contracts with the
5  district attorneys' offices, and serve as merchants and district
6  attorneys' offices' contact at DATS.  (Id. at 20:12-13, 45:3-5,
7  140:10-12; Kline Dep. 22:6-14 (stating that she did not refer to
8  DATS by its name, but knew it by the defendant's name, "Henry").
9  In negotiating the contracts with district attorneys' offices,
10 Craighead also provided the district attorneys' offices with
11 copies of DATS' collection letters.  (Craighead Dep. 45:15-17.)
12 Without Craighead, therefore, DATS would not have received bad
13 checks and could not have attempted to collect the checks
14 pursuant to the BCDA.

15       By his own admission, Craighead also "regularly
16 interface[d] with clients, victims, and check writers" and
17 "help[ed] administer" DATS' collection efforts.  (Arons Decl. Ex.
18 2 (Craighead's Resp. to Pls.' Interrog. # 1)); see also Newman v.
19 Checkrite Cal., Inc., 912 F. Supp. 1354, 1372 (E.D. Cal. 1995)
20 (finding personal liability when the defendant was "directly
21 involved in the day-to-day operation of [the debt collection
22 business], including training and managing employees, and
23 reviewing or supervising the review of all accounts").  In fact,
24 Craighead does not identify a single responsibility he had at
25 DATS that did not involve collecting debts.  Accordingly, the
26 court finds that Craighead "regularly collect[ed] or attempt[ed]
27 to collect, directly or indirectly, debts owed or due or asserted
28 to be owed or due another," thereby qualifying him as a debt

24

collector under the FDCPA and exposing him to personal liability under the FDCPA. 15 U.S.C. § 1692a(6).

### 3. FDCPA Violations

A debt collector's single action or procedure can give rise to multiple violations of the FDCPA. Clark v. Capital Credit & Collection Servs., Inc., 460 F.3d 1162, 1177 (9th Cir. 2006). To enter summary judgment in plaintiffs' favor with regard to Craighead's liability under the FDCPA, the court need only find a single violation. See id. § 1692k(a), (b)(2) (establishing liability for "any debt collector who fails to comply with any provision of this subchapter"). The court cannot, however, cease its inquiry upon finding one violation because, to award damages, the court must consider "the frequency and persistence of noncompliance by the debt collector [and] the nature of such noncompliance." See 15 U.S.C. § 1692k(a), (b)(2) (establishing liability for "any debt collector who fails to comply with any provision of this subchapter" and enumerating the factors the court must consider in awarding damages in class actions); accord Chan v. N. Am. Collectors, Inc., No. 06-0016, 2006 WL 778642, at *3 (N.D. Cal. Mar. 24, 2006).

When determining whether a debt collector violated the FDCPA, the court's focus is on the actions of the debt collector, not the debtor. Freyermuth v. Credit Bureau Servs., Inc., 248 F.3d 767, 771 (8th Cir. 2001). With the exception of the narrow bona fide error affirmative defense in § 1692k(c), the FDCPA imposes strict liability on debt collectors. Clark, 460 F.3d at 1176-77; Irwin v. Mascott, 112 F. Supp. 2d 937, 963 (N.D. Cal. 2000) ("'The FDCPA is a strict liability statute and thus does

1   not require a showing of intentional conduct on the part of the

2   debt collector.'") (citations omitted).  Still, the court must

3   consider "the extent to which the debt collector's noncompliance

4   was intentional" in awarding damages.  15 U.S.C. § 1692k(b)(2).

5            To determine whether a communication violates the

6   FDCPA, the court must apply the "least sophisticated debtor"

7   standard, which determines whether the communication is "likely

8   to deceive or mislead a hypothetical 'least sophisticated

9   debtor.'"  Terran v. Kaplan, 109 F.3d 1428, 1431 (9th Cir. 1997)

10  (quoting Swanson v. S. Or. Credit Serv., Inc., 869 F.2d 1222,

11  1225 (9th Cir. 1988)).  This "objective . . . standard is 'lower

12  than simply examining whether particular language would deceive

13  or mislead a reasonable debtor.'"  Terran, 109 F.3d at 1431-32

14  (citation omitted).  Whether a communication would "confuse a

15  least sophisticated debtor," thereby violating the FDCPA, is a

16  question of law.  Id. at 1432 (citation omitted).  The least

17  sophisticated debtor standard governs the court's evaluation of

18  DATS' communications, which plaintiffs allege violate subsections

19  of §§ 1692e and 1692f.  Guerrero v. RJM Acquisitions, L.L.C., 499

20  F.3d 926, 934 (9th Cir. 2007) (stating that the least

21  sophisticated debtor standard applies to violations of §§ 1692d,

22  1692e, and 1692f).

23           Plaintiffs allege that Craighead violated the FDCPA

24  based on DATS' (a) use of district attorneys' names and titles in

25  its letterheads; (b) statements that it would pursue criminal

26  investigation, arrest, and prosecution; (c) collection of

27  unauthorized fees; and (d) omission of FDCPA-required language.

28  As discussed in more detail above, Craighead can be held

personally liable for the FDCPA violations resulting from the content of DATS' letters and its collection of fees.

a.   <u>Subsections 1692e(3), (9), (10), (14): Use of District Attorneys' Names and Titles</u>

Plaintiffs contend that DATS' practice of including the name and title of the local district attorney in the letterhead of its collection letters violated several subsections of § 1692e, which define conduct that violates § 1692e's prohibition of a "false, deceptive, or misleading representation or means in connection with the collection of any debt." <u>Id.</u> § 1692e.

Subsection 1692e(3) prohibits the "false representation or implication that any individual is an attorney or that any communication is from an attorney." 15 U.S.C. § 1692e(3). "A debt collector violates this section of the FDCPA when a letter appears to be sent by an attorney without the attorney's having both reviewed the debtor's file and gained some knowledge about the specific debt." <u>Irwin v. Mascott</u>, 112 F. Supp. 2d 937, 948-49 (N.D. Cal. 2000) (citation omitted); <u>see also</u> <u>Avila v. Rubin</u>, 84 F.3d 222, 228 (7th Cir. 1996) ("[A]n attorney sending dunning letters must be directly and personally involved in the mailing of the letters in order to comply with the strictures of FDCPA.").

Even though a district attorney did not sign any of DATS' form letters, the "least sophisticated debtor" could conclude that letters were from an attorney because all of the letters include the name and title of the county's district attorney. <u>See</u> <u>Newman v. Checkrite Cal., Inc.</u>, 912 F. Supp. 1354, 1382 (E.D. Cal. 1995) (treating a letter where the attorney's

27

1  name appears only in the letterhead the same as a letter signed

2  by an attorney); Greco v. Trauner, Cohen & Thomas, L.L.P., 412

3  F.3d 360, 364 (2d Cir. 2005) ("[A] letter sent on law firm

4  letterhead, standing alone, does represent a level of attorney

5  involvement to the debtor receiving the letter.").[14]

6       Because the letters appear to be from a district

7  attorney's office, § 1692e(3) requires that the respective

8  district attorney reviewed each file and decided that DATS should

9  send each collection letter to each particular debtor.  Newman,

10 912 F. Supp. at 1382.  The attorney's review must be thorough

11 enough to amount to an "individualized investigation" of a

12 particular debtor's case.  Id. at 1382.  For example, the Irwin

13 court held that an attorney's review and notation on a

14 spreadsheet that itemized each debtor's name, address, check

15 amount, and merchant name was insufficient.  Irwin, 112 F. Supp.

16 2d at 950.  The court concluded that "[t]he attorneys merely

17 scanned the spreadsheets and the completed letters to satisfy

18 some rote requirement that their eyes should fall on the

19 documents before letters were sent out.  The communications to

20 check writers were not 'from' an attorney in any meaningful sense

21 of the word."  Id.

22

23 ──────────────

24     [14]  The court recognizes that other statements in the
   letters, such as providing a telephone number with a 916 area
25 code and a P.O. Box in Fair Oaks, California and stating that the
   debtor's file "will be sent to the District Attorney's Office for
26 review" if the debtor does not pay, suggest that the letters are
   not from a district attorney's office.  (Arons Decl. Ex. 5
27 (emphasis added).)  While these facts may lead a reasonable
   debtor to conclude that the letters were not from a district
28 attorney's office, they do not preclude the least sophisticated
   debtor from concluding that the letters were not from a district
   attorney's office.

1    The undisputed facts show that the only review that may

2   have occurred prior to DATS sending its initial letters was a

3   district attorney's review of DATS' weekly check entry report.

4   There is a genuine issue of material fact whether such a review

5   actually occurred because Craighead testified in his deposition

6   that DATS never proceeded without a response from the respective

7   district attorney, (Craighead Dep. 9:19-22), but his August 23,

8   2005 letter states that DATS would perceive the district

9   attorney's silence as approval to proceed.  (Arons Decl. Ex. 28.)

10  Further, neither party has produced evidence indicating the

11  content of DATS' weekly check entry reports,[15] therefore, even if

12  a district attorney reviewed each report and instructed DATS to

13  proceed, the court cannot determine whether the reports contained

14  sufficient information for the district attorney to perform a

15  meaningful review.

16    Subsection 1692e(3)'s restrictions similarly apply to

17  each letter DATS sent after its initial letter.  <u>Irwin</u>, 112 F.

18  Supp. 2d at 949 ("[Section 1692e(3) is violated i]f the attorney

19  did not first conduct an individual review of the debtor's case,

20  <u>or</u> if the attorney did not determine if a particular letter

21  should be sent . . . .") (emphasis added).  It is undisputed that

22  DATS continued its automated collection efforts with subsequent

23  form letters without input from the respective district

24

25

26      [15]   Craighead contends the weekly submission included the
    merchant's Preliminary Bad Check Report and Request for
    Complaint, which includes a copy of the check and details about
27  the transaction in which it was issued.  (Craighead Decl. in
    Supp. of Mot. for Summ. J. Ex. 1.)  The form Craighead submitted,
28  however, is dated March 6, 2006, which was after plaintiffs filed
    this lawsuit and the class period closed.

attorney's office.   Therefore, Craighead is liable for DATS'
practice of sending subsequent collection letters with the
district attorney's name in the letterhead violated § 1692e(3)
because a district attorney never reviewed a debtor's file and
determined that DATS should send a particular letter.   See Clomon
v. Jackson, 988 F.2d 1314, 1321 (2d Cir. 1993) ("[Using an
attorney's letterhead and signature] was false or misleading
because, [the attorney] played virtually no day-to-day role in
the debt collection process--and certainly did not engage in any
discussion with [the debt collectors] about how to collect
[plaintiff's] debt."); see also id. ("[T]here will be few, if
any, cases in which a mass-produced collection letter bearing the
facsimile of an attorney's signature will comply with the
restrictions imposed by § 1692e.").

        Subsection 1692e(9) prohibits "[t]he use or
distribution of any written communication . . . which creates a
false impression as to its source, authorization, or approval."
15 U.S.C. § 1692e(9).   Similar to the court's conclusion that the
least sophisticated debtor could conclude that DATS' letters were
"from" a district attorney, it follows that such a debtor could
also conclude that a district attorney's office issued,
authorized, or approved the letters.   See also Gradisher v. Check
Enforcement Unit, Inc., 210 F. Supp. 2d 907, 914 (W.D. Mich.
2002) (concluding that a collection agency had a contract with
and was affiliated with a state agency violated § 1692e(9) when
it sent letters on the agency's letterhead and omitted reference
to itself).   Craighead, therefore, is also liable under §
1692e(9).

Subsection 1692e(14) prohibits "[t]he use of any business, company, or organization name other than the true name of the debt collector's business, company, or organization."  15 U.S.C. § 1692e(14).  Craighead is liable under this subsection because none of DATS' letters used its true name (DATS) or the name it was registered as doing business under (CSS).  Based on the court's preceding conclusions regarding subsections (3), (9), and (14), Craighead is also liable under § 1692e(10)'s more general prohibition against "[t]he use of any false representation or deceptive means to collect or attempt to collect any debt . . . ."  Id. § 1692e (defining the conduct subsections (3), (9), and (14) prohibit as using "any false, deceptive, or misleading representation or means in connection with the collection of any debt").

> b.   Subsections 1692e(4), (5): False Threats
> Without Intent

Subsection 1692e(4) prohibits "[t]he representation or implication that nonpayment of any debt will result in the arrest or imprisonment of any person . . . unless such action is lawful and the debt collector or creditor intends to take such action."  Id. § 1692e(4).  Similarly, § 1692e(5) prohibits "[t]he threat to take any action that cannot legally be taken or that is not intended to be taken."  Id. § 1692e(5).  To determine whether a debt collector violated these subsections, the court must apply a two-pronged test evaluating (1) whether, from the perspective of the least sophisticated debtor, the debt collector threatened legal action or arrest; and (2) whether the debt collector could legally take such action and had the intent to do so.  Newman v.

Checkrite Cal., Inc., 912 F. Supp. 1354, 1379 (E.D. Cal. 1995).

Statements in debt collection letters may constitute threats to take legal action when they are "calculated to intimidate the least sophisticated consumer into believing that legal action against her is imminent" and "that the debtor's only options are either payment or being sued." Irwin v. Mascott, 96 F. Supp. 2d 968, 951 (N.D. Cal. 1999). The conditional nature of a statement, such as the use of the words "may" or "possible," does not negate the existence of a threat if a letter, in its entirety, could lead the least sophisticated debtor to believe that legal action is a real possibility. See id. at 951 ("The use of the word 'may' does not mitigate the tone of the letter which purports to be a 'formal notice' . . . ."); see also Baker v. G. C. Servs. Corp., 677 F.2d 775, 779 (9th Cir. 1982) (upholding a district court's determination that a statement constituted a threat when it "'create(d) the impression that legal action by the defendant is a real possibility . . .'") (alteration in original).

In its first letter, DATS informed the debtor that a complaint had been submitted accusing the debtor of a violation of California Penal Code section 476a and that the only way "[t]o suspend this criminal investigation" was to submit information or pay the debt. (Arons Decl. Ex. 3.) The letter also explained that failure to respond to the notice "may result in further investigation with the possible issuance of a criminal complaint and ARREST warrant." (Id. (emphasis in original).) DATS' second letter, titled "FINAL NOTICE PRIOR TO REFERRAL FOR POSSIBLE ARREST WARRANT," indicated that the debtor's failure to pay "will

32

1  result in your case being reviewed for possible criminal

2  prosecution." (<u>Id.</u> Ex. 4 (emphasis in original).)  In its third

3  letter, DATS referenced the "serious criminal complaint"

4  submitted against the debtor and explained that, if the debtor

5  did not pay, DATS would order the debtor's bank records and the

6  debtor's "file will be sent to the District Attorney's Office for

7  review and possible issuance of an arrest warrant . . . ." (<u>Id.</u>

8  Ex. 5.)

9        The three letters DATS primarily used and the remainder

10  of its letters before the court convey the common theme that the

11  debtor's failure to pay could result in criminal investigation,

12  arrest, and prosecution.  Under the least sophisticated debtor

13  standard, this court finds that the statements in DATS' letters

14  constitute threats of legal action or arrest under § 1692e(4)-

15  (5).

16        Still, the letters violate subsections (4) and (5) only

17  if DATS could not legally take the threatened action or did not

18  intend to take the threatened action.  To determine whether DATS

19  could legally initiate criminal investigations, arrests, or

20  prosecutions, the court must look to state law.  <u>Newman v.</u>

21  <u>Checkrite Cal., Inc.</u>, 912 F. Supp. 1354, 1380 (E.D. Cal. 1995).

22  Craighead identifies only California's BCDA as authorizing DATS'

23  threats in its letters.  Not only does the BCDA allow DATS to

24  reference potential legal action in a notice pursuant to the

25  BCDA, it requires that such a notice include "[a] statement of

26  the penalty for issuance of a bad check."  Cal. Penal Code §

27  1001.63(d).

28        Nonetheless, while the BCDA authorizes a diversion

letter to describe the penalty a bad check writer may face, DATS'
program suffered a more fundamental deficiency--DATS did not
ensure that it sent letters only to "bad check" writers as the
BCDA contemplates.  Specifically, section 1001.60 of the BCDA
establishes that the program applies only to "persons who write
bad checks" and explains that "'writing a bad check' means
making, drawing, uttering, or delivering any check or draft upon
any bank or depository for the payment of money where there is
probable cause to believe there has been a violation of [Penal
Code] Section 476a."  Cal. Penal Code § 1001.60; see also id. §
476a (criminalizing willfully issuing a bad check with the intent
to defraud).  The BCDA, therefore, can authorize DATS to send a
letter to an individual only if there is probable cause to
believe the individual violated section 476a.

        Thereafter, even if an individual qualifies as a bad
check writer, the district attorney, not a private entity
conducting the program, must still determine whether to refer a
particular case to the program.  Id. § 1001.62.  To "determine if
[a] case is one which is appropriate to be referred to a bad
check diversion program, the district attorney must consider five
factors:

        (a) The amount of the bad check.  (b) If the person has
        a prior criminal record or has previously been diverted.
        (c) The number of bad check grievances against the person
        previously received by the district attorney. (d) Whether
        there are other bad check grievances currently pending
        against the person. (e) The strength of the evidence, if
        any, of intent to defraud the victim.

Id. § 1001.62.

        With respect to the requisite probable cause
determination, plaintiffs first contend that section 1001.60

requires a district attorney to determine that probable cause
exists to believe an individual violated section 476a.  Id. §
1001.60. While the FDCPA requires a district attorney to make
such a finding to come within § 1692p's exception, the BCDA does
not explicitly require the district attorney to make the probable
cause determination.  In fact, the BCDA appears to presume that
the probable cause determination will have been made before a
district attorney receives a bad check.  See id. § 1001.60
(defining "writing a bad check" to include only debtors where
there is probable cause to believe they violated section 476a);
id. § 1001.62 ("On receipt of a bad check case, the district
attorney shall . . . ."). Therefore, under the BCDA's statutory
framework, a merchant could make the requisite probable cause
determination.  See People v. Mack, 66 Cal. App. 3d 839, 845
(1977) ("There is nothing inherent in the process of determining
probable cause that renders it beyond the capacity of lay persons
to resolve.") (citing Shadwick v. City of Tampa, 407 U.S. 345,
351-52 (1972)).

        It is undisputed that, at least in some cases, the
merchants informed a check writer that a check was returned due
to insufficient funds and attempted to collect payment from the
check writer prior to submitting the check to DATS. (Shonts Dep.
14-17.)  In those cases, the merchants could have made the
probable cause finding that the BCDA requires.  Morris v. Moore,
61 Cal. App. 314, 318-19 (1923) (finding probable cause of intent
to defraud when a check writer received notice that the check was
dishonored and failed to pay or provide an explanation).  If,
however, a merchant did not attempt to collect a check prior to

35

1    submitting it to DATS, the merchant could not have made the

2    requisite probable cause finding.  See Edgerly v. City & County

3    of San Francisco, 495 F.3d 645, 651 (9th Cir. 2007) ("Generally,

4    officers need not have probable cause for every element of the

5    offense [to make a warrantless arrest], but they must have

6    probable cause for specific intent when it is a required

7    element.").

8            In cases where a merchant could not have made the

9    requisite probable cause finding, only the district attorney

10   could have made the determination.  Specifically, section 1001.60

11   uses the probable cause limitation to define the universe of

12   cases that may be considered for the program and section 1001.62

13   establishes that, of those who may be considered for the program,

14   only the district attorney may refer them to the program.  See

15   Cal. Penal Code § 1001.62 ("On receipt of a bad check case, the

16   district attorney shall . . . .").  Therefore, because only the

17   district attorney may refer a case to the program, a private

18   entity conducting the program cannot make the probable cause

19   determination that the statute presumes will occur prior to

20   referral.  See People v. Jenkins, 10 Cal. 4th 234, 246 (1995)

21   ("In determining [the Legislature's] intent, we consider the

22   statute read as a whole, harmonizing the various elements by

23   considering each clause and section in the context of the overall

24   statutory framework.  We must select the construction that

25   comports most closely with the apparent intent of the Legislature

26   . . . and avoid an interpretation that would lead to absurd

27   consequences.") (internal citations omitted).

28           As discussed above, the court lacks sufficient evidence

36

1   to determine that a merchant or district attorney made the
2   requisite probable cause determination.   The court also lacks
3   sufficient evidence to determine, as a matter of law, that a
4   district attorney considered the requisite BCDA factors.
5   Therefore, there is a genuine issue of material fact with respect
6   to whether the BCDA authorized DATS' threats.

7           Regardless, even if the BCDA authorized DATS to take
8   the actions it threatened, Craighead can still be liable under §
9   1692e(4) because DATS lacked the intent to take the threatened
10  actions at the time it sent many of its letters.   Craighead
11  testified in his deposition that DATS reviewed a debtor's file to
12  determine if it satisfied the prosecutor's guidelines after DATS
13  sent its first two collection letters.   (Craighead Dep. 49:2-7,
14  50:16.)   Therefore, DATS sent letters threatening legal action
15  and arrest to many debtors when DATS never intended to send the
16  files to the respective district attorneys' offices because the
17  debtors' files did not meet the minimum requirements for
18  referral.   See Irwin v. Mascott, 112 F. Supp. 2d 937, 952 (N.D.
19  Cal. 1999) ("A false threat to take action may be established by
20  showing that no assessment has been made as to whether the threat
21  will be carried out.") (citation omitted); see also Newman v.
22  Checkrite Cal., Inc., 912 F. Supp. 1354, 1380-81 (E.D. Cal. 1995)
23  (finding that a defendant lacked intent to file suit in
24  California because he was not a member of the California bar at
25  the time he sent the letter and that a second defendant lacked
26  intent to file a lawsuit because none of the plaintiffs fell
27  within the defendant's criteria for filing a lawsuit).   As to
28  subsequent letters, the court lacks sufficient evidence to

determine that DATS intended to carry out the threatened actions.

Accordingly, Craighead is liable under § 1692e(4)-(5) based on DATS' threats in its first two letters.

### c. Subsections 1692f(1) and 1692e(2): Collection of Unauthorized Fees

Section 1692f prohibits a debt collector from using "unfair or unconscionable means to collect or attempt to collect any debt," which includes "[t]he collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law." 15 U.S.C. § 1692f(1).  To establish that a particular fee does not violate § 1692f(1), the debt collector must identify a state law that authorizes the fee.  Newman, 912 F. Supp. at 1367-68.

Craighead contends that the BCDA authorized the fees DATS charged.[16]  Plaintiffs argue, however, that section 1001.65 did not authorize the fees DATS collected because DATS did not comply with the BCDA's requirements and, even if the BCDA authorized DATS to collect fees despite its non-compliance, it collected fees in excess of those section 1001.65 authorized.

If a debtor elects to enter diversion, section 1001.65 of the BCDA authorizes the district attorney, or a private

---

[16]    To the extent Craighead argues that California Penal Code section 476a authorized the fees DATS collected, his argument is without merit.  Section 476a authorizes only a "sheriff's department, police department, or other law enforcement agency" to collect a $25.00 processing fee and bank charges incurred by the victim if the check was referred to its agency for investigation of an alleged violation of section 476a. Cal. Penal Code § 476a(g).

company contracting with the district attorney pursuant to the BCDA, to collect two fees: 1) a processing fee not to exceed $35.00 for each bad check; and 2) actual bank charges not exceeding $10.00, which must be paid to the victim.  Cal. Penal Code § 1001.65(a), (c); see also id. § 1001.65(b) (allowing a judge to award additional fees after a criminal conviction).

As discussed above, there is a genuine issue of material fact with respect to the involvement, if any, of the respective district attorney's office prior to DATS' initiation of collection efforts.  Because the court cannot determine that DATS functioned pursuant to the BCDA and plaintiffs have not shown that the BCDA requires complete compliance to authorize fees, the court cannot determine, as a matter of law, that the BCDA authorized DATS to collect fees.  Therefore, the court cannot enter summary judgment with respect to the $35.00 processing fee and actual bank charges paid to the victim.

With certain debtors, however, DATS collected three fees that the BCDA did not authorize: 1) an $85.00 diversion fee; 2) a $25.00 finance fee if a debtor elected to pay in installments; and 3) bank fees in excess of what a bank actually charged a merchant.[17]  Therefore, Craighead is liable under §

---

[17]   With regard to bank fees, the only evidence plaintiffs submitted shows that DATS charged Schwarm a $10.00 bank fee for her check to Walmart and a $5.00 bank fee for her check to SaveMart even though Walmart did not pay a bank fee for returned checks and SaveMart's fee was only $0.55.  (Arons Decl. Exs. 3-4; Perea Decl. ¶ 8; Kline Dep. 13:13-24.)  Plaintiffs also argue that DATS charged $10.00 bank fees for Certegy checks and that, as a check guarantee company, Certegy did not incur bank fees. (Pls.' Mem. in Supp. of Mot. for Summ. J. 23:12-15.)  Plaintiffs do not, however, offer evidence to support this statement or show that Certegy did not collect merchants' bank fees to reimburse the merchants.  Based on this limited evidence, the court cannot

39

1692f(1) based on DATS' collection of the three aforementioned fees.

DATS' collection of unauthorized fees also violated § 1692e(2)(A)-(B), which prohibits "[t]he false representation of-- (A) the character, amount, or legal status of any debt; or (B) any services rendered or compensation which may be lawfully received by any debt collector for the collection of a debt."  15 U.S.C. § 1692e(2)(A)-(B); see also Newman, 912 F. Supp. at 1367 (collapsing its analysis defendants' violations of §§ 1692f(1) and 1692e(2)(A)-(B)).

> d.   Subsections 1692e(11), 1692g(a): Omission of Required Language and Validation Notices

In the initial communication with a debtor, § 1692e(11) requires the debt collector to include a statement that it "is attempting to collect a debt and that any information obtained will be used for that purpose . . . ."  15 U.S.C. § 1692e(11). In its first letter, DATS included the requisite language, therefore Craighead is not liable under § 1692e(11).

As the Ninth Circuit has summarized, § 1692g(a) also requires that the initial debt collection communication contain:

> (1) the amount of the debt; (2) the name of the creditor; (3) a statement that if the consumer, within thirty days after receipt of the notice, disputes the validity of the debt, or any portion thereof, the debt will be assumed to be valid by the debt collector; (4) a statement that if the consumer disputes the debt, the debt collector will mail the consumer verification of the debt or a copy of a judgment; and (5) a statement that, upon the consumer's written request, the debt collector will provide the consumer with the name and address of the original creditor, if different from the current creditor.

---

determine the amount of bank fees DATS charged in excess of those actually incurred by the merchant.

Terran v. Kaplan, 109 F.3d 1428, 1430 (9th Cir. 1997); 15 U.S.C. § 1692g(a). While DATS' first letter in its series contains the first two requirements, it does not contain the statements detailed in the third through fifth requirements. Therefore, Craighead is liable under § 1692g(a) based on DATS' omission of the last three requirements.

Subsection 1692e(11) also requires that, in any "subsequent communication," the debt collector must disclose "that the communication is from a debt collector." 15 U.S.C. § 1692e(11).[18] Of the eleven subsequent communications plaintiffs provided in support of their motion, only two include the requisite disclosures that the communications are from a debt collector. The remaining nine omit any reference to debt collection and, for example, refer to the delinquent amount as

---

[18] In Pressley v. Capital Credit & Collection Serv., Inc., 760 F.2d 922 (9th Cir. 1985), the Ninth Circuit held that § 1692e(11)'s requirements do not apply to a "follow up notice which only demands a payment as earlier requested" so long as there is no evidence that the debt collector's communications were abusive, false, deceptive, or misleading. Id. at 925. The court reasoned that a follow up notice did not constitute a "communication" as used in § 1692e(11). Id. The court's decision, however, was based on a prior version of § 1692e(11). Id. Unlike the prior version, which applied to "all communications," Congress amended subsection (11) in 1996 to differentiate between "initial" communications and "subsequent" communications. 15 U.S.C. § 1692e(11). The 1996 amendment also limited the requisite disclosure for subsequent communications to include only that the communication is from a debt collector. This limitation is consistent with the Ninth Circuit's reasoning that Congress did not intend for the full disclosure the pre-1996 version of subsection (11) required to be in every subsequent communication. Id. Therefore, in light of the 1996 amendments to § 1692e(11), the Ninth Circuit's holding that § 1692e(11) does not apply to follow up notices is no longer good law. But see Newman v. Checkrite Cal., Inc., 912 F. Supp. 1354, 1381 (E.D. Cal. 1995) (applying Pressley to disclosures required by § 1692g(b) and recognizing other circuits' pre-1996 criticism of Pressley).

1  "restitution," (Arons Decl. Exs. 4, 8, 9, 11-12), state that the

2  letters are giving the check writer "the opportunity to avoid

3  possible criminal prosecution," (id. Ex. 5), or state that

4  "criminal sanctions are pending." (Id. Ex. 13.)  One letter even

5  negates the requisite language, stating:  "This is not a Civil

6  issue under 15 USC 1692e requiring the following statement; 'This

7  is an attempt to collect a debt and any information obtained will

8  be used for that purpose.'  This is a Criminal issue under Penal

9  Code 476a." (Id. Ex. 8.)  Craighead, therefore, is liable under

10  § 1692e(11) based on DATS' subsequent letters that omit the

11  requisite FDCPA language.

12          4.   FDCPA Damages

13          Based on a single violation of the FDCPA, a plaintiff

14  is entitled to:

15          (1) any actual damage sustained by such person as a
        result of such failure;
16          (2) . . . (B) in the case of a class action, (I) such
        amount for each named plaintiff as could be recovered
17          under subparagraph (A), and (ii) such amount as the court
        may allow for all other class members, without regard to
18          a minimum individual recovery, not to exceed the lesser
        of $500,000 or 1 per centum of the net worth of the debt
19          collector; and
          (3) in the case of any successful action to enforce the
20          foregoing liability, the costs of the action, together
        with a reasonable attorney's fee as determined by the
21          court. . . .

22  15 U.S.C. § 1692k(a).  To award damages under the FDCPA, the

23  court must consider "the frequency and persistence of

24  noncompliance by the debt collector, the nature of such

25  noncompliance, the resources of the debt collector, the number of

26  persons adversely affected, and the extent to which the debt

27  collector's noncompliance was intentional." Id. § 1692k(b)(2).

28          The only evidence plaintiffs submitted with respect to

1    damages was the total fees DATS collected between July 1, 2003

2    and September 30, 2005, including a monthly average for the

3    twelve months prior to plaintiff's filing of their motion for

4    summary judgment.  (Pls.' Mem. in Supp. of Mot. for Summ. J.

5    49:15-20-50:1-4.)  The court cannot award damages based only on

6    the fees DATS collected because such as an award fails to account

7    for the factors the FDCPA requires the court to consider and

8    presumes that the fees <u>DATS</u> collected in violation of the FDCPA

9    equate to the damages the court should award against <u>Craighead</u>.[19]

10    Therefore, because plaintiffs have not submitted sufficient

11   evidence, the court must deny plaintiffs' motion for summary

12   judgment with respect to a determination of damages.

13          B.    <u>42 U.S.C. § 1983 Claims</u>

14          Section 1983 is not itself a source of substantive

15   rights, but merely provides a method for vindicating federal

16   rights that are conferred elsewhere.  <u>Graham v. Connor</u>, 490 U.S.

17   386, 394-95 (1989).  Section 1983 imposes personal liability and

18   requires that the defendant was personally involved in the

19   alleged constitutional violations.  <u>Jones v. Williams</u>, 297 F.3d

20   930, 934 (9th Cir. 2002).  While it does not impose vicarious

21   liability, a supervisor can be "liable for constitutional

22   violations of his subordinates if the supervisor participated in

23   or directed the violations, or knew of the violations and failed

24   to act to prevent them."  <u>Taylor v. List</u>, 880 F.2d 1040, 1045

25   (9th Cir. 1989).  Based on the court's discussion with respect to

26

27          [19]    Such calculations are also insufficient because, as
     discussed above, there are genuine issues of material fact with
28   regard to amount of the fees DATS collected in violation of the
     FDCPA.

43

Craighead's personal liability under the FDCPA, the court finds
that he can be personally liable for any constitutional
violations resulting from DATS' automated collection procedures
and letters.

For the court to enter summary judgment in favor of
plaintiffs on their § 1983 claims, plaintiffs must show that
Craighead (1) acted under color of state law and (2) deprived
plaintiffs of rights secured by the Constitution or a federal
statute.  <u>Gibson v. United States</u>, 781 F.2d 1334, 1338 (9th Cir.
1986).  "Private parties act under color of state law if they
willfully participate in joint action with state officials to
deprive others of constitutional rights."  <u>United Steelworkers of</u>
<u>Am. v. Phelps Dodge Corp.</u>, 865 F.2d 1539, 1540 (9th Cir. 1989)
(citations omitted); <u>accord</u> <u>Franklin v. Terr</u>, 201 F.3d 1098,
1100-01 (9th Cir. 2000).  It is undisputed that Craighead acted
under color of state law.  To satisfy the second element of their
§ 1983 claims, plaintiffs do not argue that the rights of which
they were deprived were those conferred by the FDCPA.  Rather,
plaintiffs argue that Craighead deprived them of their Fourteenth
Amendment procedural due process rights.

"'To establish a violation of procedural due process a
plaintiff must demonstrate: (1) a deprivation of a
constitutionally protected liberty or property interest, and (2)
a denial of adequate procedural protections.'"  <u>Tutor-Saliba</u>
<u>Corp. v. City of Hailey</u>, 452 F.3d 1055, 1061 (9th Cir. 2006)
(quoting <u>Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.</u>,
149 F.3d 971, 982 (9th Cir.1998)).  The procedural due process
requirements under the California Constitution closely follow the

44

1  federal requirements except that California does not require a

2  plaintiff to "establish a property or liberty interest as a

3  prerequisite to invoking due process protection." <u>Ryan v. Cal.</u>

4  <u>Interscholastic Fed'n-San Diego Section</u>, 94 Cal. App. 4th 1048,

5  1069 (2001) (citation omitted); <u>accord</u> <u>Toussaint v. McCarthy</u>, 801

6  F.2d 1080, 1097 (9th Cir. 1986).  This distinction does not alter

7  the analysis in this case because it is undisputed that money

8  constitutes a property interest protected by the Fourteenth

9  Amendment.  <u>Board of Regents v. Roth</u>, 408 U.S. 564, 571-72

10  (1972).  Therefore, to be entitled to summary judgment on their

11  federal and state due process claims, plaintiffs must show that

12  Craighead deprived them of money without due process of law.

13        A deprivation of property does not occur when

14  individuals voluntarily relinquish their property rights.  <u>See</u>

15  <u>Ulrich v. City & County of San Francisco</u>, 308 F.3d 968, 974 (9th

16  Cir. 2002).  As three district courts have recognized, "[c]heck

17  writers who receive a [DATS] letter of notice are given two

18  options: (1) enroll in the program and pay the check amount plus

19  program fees, or (2) not enroll in the program and face the

20  possibility of a criminal proceeding conducted in accordance with

21  due process." <u>Hamilton v. Am. Corrective Counseling Servs.,</u>

22  <u>Inc.</u>, No. 3:05-434, 2006 WL 3332828, at *4 (N.D. Ind. Nov. 14,

23  2006); <u>del Campo v. Kennedy</u>, 491 F. Supp. 2d 891, 902 (N.D. Cal.

24  2006); <u>Gradisher v. County of Muskegon</u>, 255 F. Supp. 2d 720, 728

25  (W.D. Mich. 2003).[20]  Therefore, unlike cases where the

26  _____

27        [20]   In their fifty-two-page memorandum of points and
    authorities in support of their motion for summary judgment,
28  plaintiffs neglect to mention that three district courts have
    rejected, <u>on motions to dismiss</u>, due process claims attacking

1   government garnishes a plaintiff's wages or levies the

2   plaintiff's bank account, plaintiffs in this case voluntarily

3   sent payments to DATS.  See, e.g., Sniadach v. Family Fin. Corp.

4   of Bay View, 395 U.S. 337, 341-42 (1969) (prejudgment garnishment

5   of wages without a hearing violated due process).

6           Nonetheless, plaintiffs argue that even though their

7   physical act of sending payments to DATS was voluntary, they did

8   not voluntarily relinquish their property interests because DATS'

9   misrepresentations coerced plaintiffs to send the payments.

10  Instead of identifying allegedly false or misleading statements

11  to support their argument, however, plaintiffs state in

12  conclusory terms that DATS' "collection letters speak for

13  themselves." (Pls.' Mem. in Supp. of Mot. for Summ. J. 36 n.13.)

14  This reasoning attempts to elevate the FDCPA's detailed debt

15  collection prohibitions to due process violations.  Just because

16  a letter is found misleading under the FDCPA's expansive

17  definitions and the least sophisticated debtor standard, it does

18  not follow that the same letter is misleading or false for

19  purposes of procedural due process.[21]

20  _____

21  substantially similar bad check diversion programs.  Even more
    disturbing to the court than this omission is the fact that, of
22  plaintiffs' five counsel in this case, four of the attorneys were
    counsel for the plaintiffs in one or more of the three
23  aforementioned cases.  Plaintiffs' counsel's conscious decision
    not address, let alone cite, the only cases directly on point
24  shocks the conscience of this court.

25          [21]   Plaintiffs also inform the court that it "can draw upon
    the experience of other courts that have examined the collection
26  notices sent by District Attorney Bad Check Diversion programs."
    (Pls.' Mem. in Supp. of Mot. for Summ. J. 36 n.13.)  All of the
27  cases plaintiffs cite, however, are factually and legally
    distinguishable.  See, e.g., In re Byrd, 256 B.R. 246, 253
28  (Bankr. E.D. N.C. 2000) (addressing a bad check diversion program
    in which the debtor was required to pay the restitution to be

1    When viewed outside the context of the FDCPA, DATS'
2    letters were not false, misleading, or coercive.  Specifically,
3    the use of the district attorney's name in the letterhead was not
4    false or misleading because DATS' contract with the respective
5    district attorney's office provided that DATS would serve "as a
6    direct representative of [the district attorney.]"  (Arons Decl.
7    Ex. 19 at ¶ 1.4.)  DATS' statements about potential criminal
8    investigation, arrest, and prosecution were also not false or
9    misleading because all of the statements were conditional and the
10   district attorney's office had the authority to begin criminal
11   investigations with regard to whether the particular debtor
12   violated California Penal Code section 476a.  Overall, while
13   DATS' form letters are far from model BCDA letters--as evidenced
14   by the multitude of FDCPA violations--they do not amount to
15   coercion under the due process clause.  See Gradisher v. County
16   of Muskegon, 255 F. Supp. 2d 720, 728-30 (W.D. Mich. 2003)
17   (concluding, after a detailed review of the language in the
18   collection letters, that language substantially similar to the
19   language in DATS' collection letters was not false and misleading
20   for purposes of the due process clause).

21   Accordingly, because DATS' letters did not transform
22   plaintiffs' voluntary remission of payments to involuntary
23   deprivations of property, Craighead did not deprive plaintiffs of
24   their property interests.

25   Furthermore, even if the content of DATS' letters

26

27   released from jail); In re Reisen, No. 03-1999, 2004 WL 764628,
     at *4-5 (Bankr. N.D. Iowa 2005) (determining whether a bad check
28   diversion program is a prosecution or debt collection for
     purposes of an automatic stay).

effectively deprived plaintiffs of their property interests, the deprivations were not without due process of law.  Procedural due process is a "flexible [concept] and calls for such procedural protections as the particular situation demands."  Morrissey v. Brewer, 408 U.S. 471, 481 (1972).  "The essential requirements of due process, . . . are notice and an opportunity to respond.  The opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement."  Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 546 (1985).

To determine whether plaintiffs were provided sufficient process, the court must apply the Matthews' balancing test, which examines "(1) the private benefits that will be terminated, (2) the decreased probability of erroneous deprivation of benefits with additional procedural safeguards and, balanced against (1) and (2), (3) the cost to the government and the public of additional procedural safeguards."  Belnap v. Chang, 707 F.2d 1100, 1103 (9th Cir. 1983) (citing Mathews v. Eldridge, 424 U.S. 319, 335 (1976)).[22]

_____

[22]  Under the California Constitution, the court must balance "the private interest that will be affected by the individual action; the risk of an erroneous deprivation of this interest through the procedures used and the probable value, if any, of additional or substitute safeguards; the dignitary interest of informing individuals of the nature, grounds and consequences of the action and of enabling them to present their side of the story before a responsible governmental official; and the government interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail."  Oberholzer v. Comm'n on Judicial Performance, 20 Cal. 4th 371, 390-91 (1999) (citations omitted).  "[O]ther than the addition of the dignity factor, the [California] balancing test for determining what procedural protections are warranted, given the governmental and private interests involved, is essentially identical to that

1    First, unlike liberty and property interests that the

2 Supreme Court has deemed significant or essential, <u>Cleveland Bd.</u>

3 <u>of Educ. v. Loudermill</u>, 470 U.S. 532, 543 (1985) (interest in

4 retaining employment); <u>Memphis Light, Gas & Water Div. v. Craft</u>,

5 436 U.S. 1, 19 (1978) (loss of electricity service), plaintiffs'

6 property interests at stake---the amount of their checks plus

7 fees ranging between $40.00 to $155.00--are "relatively minimal."

8 <u>Gradisher v. County of Muskegon</u>, 255 F. Supp. 2d 720, 730-31

9 (W.D. Mich. 2003); <u>Hamilton v. Am. Corrective Counseling Servs.,</u>

10 <u>Inc.</u>, No. 3:05-434, 2006 WL 3332828, at *5 (N.D. Ind. Nov. 14,

11 2006) (same).

12    With regard to the second factor, plaintiffs argue that

13 the process was insufficient because "it did not provide

14 plaintiffs with a procedure to challenge the legality of the

15 collection fees before a neutral decisionmaker." (Pls.' Mem. in

16 Supp. of Mot. for Summ. J. 39:4-7 (citing <u>McKesson Corp. v. Div.</u>

17 <u>of Alcoholic Beverages & Tobacco, Dep't of Bus. Regulation of</u>

18 <u>Fla.</u>, 496 U.S. 18, 39 n.21 (1990).) When addressing whether the

19 government provided sufficient process with tax exactions,

20 however, the Supreme Court explained that "[t]he State may choose

21 to provide a form of 'predeprivation process,' for example, . . .

22 by allowing taxpayers to withhold payment and then interpose

23 their objections as defenses in a tax enforcement proceeding

24 initiated by the State." <u>McKesson Corp.</u>, 496 U.S. at 36-37.

25 _____

26 employed under the federal analysis." <u>Ryan v. Cal.</u>
<u>Interscholastic Fed'n-San Diego Section</u>, 94 Cal. App. 4th 1048,
27 1071-72 (2001) (citation omitted). Plaintiffs have not argued
that DATS' collection procedures implicate a dignitary interest
28 that dictates a different result for purposes of their state due
process claims.

1  Here, plaintiffs were given this option in DATS' initial letter:

2          If you feel that you have information that has an
           important bearing on [DATS'] investigation [of the bad
3          check complaint], such as a Police report, Bank statement
           or other such documents, you must contact this office
4          Monday through Friday between the hours of 9:00AM and
           4:00PM only, at (916) 722-3009. To suspend this criminal
5          investigation you must either provide the afore mentioned
           [sic] documents or mail a "Money Order or Cashiers Check"
6          for the total amount due . . . .

7  (Arons Decl. Ex. 3.) DATS' letter, therefore, specifically

8  provided a check writer with an opportunity to contact DATS and

9  provide any information disputing the alleged bad check. As due

10 process requires, the letter was "'reasonably calculated, under

11 all the circumstances, to apprise interested parties of the

12 pendency of the action and afford them an opportunity to present

13 their objections.'" <u>Gete v. I.N.S.</u>, 121 F.3d 1285, 1297 (9th

14 Cir. 1997) (quoting <u>Mullane v. Cent. Hanover Bank & Trust Co.</u>,

15 339 U.S. 306, 314 (1950)).

16         DATS' letter also gave a check writer the option of

17 declining to enter the diversion program and allowing the

18 district attorney's office to pursue an investigation and

19 possibly a full trial--which would afford due process. The

20 debtor's option also negates a claim that DATS deprived the

21 debtor of his or her property because, once the debtor declined

22 to enter diversion, the BCDA's fees were no longer collectable.

23 <u>See</u> Cal. Penal Code § 1001.60(a) (authorizing a judge to impose a

24 collection fee only after conviction).

25         With respect to the third factor, counties have "a

26 legitimate interest in resolving bad check complaints without

27 draining judicial resources and minimizing the administrative

28 costs associated with such violations." <u>Hamilton v. Am.</u>

1   <u>Corrective Counseling Servs., Inc.</u>, No. 3:05-434, 2006 WL

2   3332828, at *5 (N.D. Ind. Nov. 14, 2006).  Implementing their

3   programs through independent contractors allows counties to

4   accomplish this interest without expending significant funds for

5   what may amount to comparatively minor violations of the penal

6   code.  <u>Gradisher v. County of Muskegon</u>, 255 F. Supp. 2d 720, 730-

7   31 (W.D. Mich. 2003).  Requiring a hearing, extensive

8   investigation, or personalized collection letters for each case

9   would increase the costs of such a program so that it would

10  become impracticable or require the debtor to pay exorbitant

11  fees.  <u>Id.</u>  Therefore, in light of the interests enumerated in

12  <u>Matthews</u>, plaintiffs fail to show that they were not afforded

13  sufficient due process.

14          Relying on <u>Tumey v. Ohio</u>, 273 U.S. 510 (1927) and its

15  progeny, plaintiffs also argue that Craighead violated their due

16  process rights because he had a substantial financial interest in

17  maintaining a high rate of collections.  In <u>Tumey</u>, the Supreme

18  Court held that a criminal defendant is deprived of due process

19  if the <u>judge</u> has a "direct, personal, substantial pecuniary

20  interest in reaching a conclusion against him in his case."  <u>Id.</u>

21  at 523 (emphasis added).  As the Supreme Court has made clear,

22  "[t]he rigid requirements of <u>Tumey</u> and <u>Ward [v. Village of</u>

23  <u>Monroeville</u>, 409 U.S. 57 (1972), were] designed for officials

24  performing judicial or quasi-judicial functions."  <u>Marshall v.</u>

25  <u>Jerrico, Inc.</u>, 446 U.S. 238, 248 (1980).  Craighead did not

26  perform a judicial or quasi-judicial function, therefore,

27  plaintiffs cannot rely on the line of cases addressing only

28  judicial or quasi-judicial functions.

1     While the Supreme Court has not directly applied <u>Tumey</u>

2  to prosecutors, it has explained that "[a] scheme injecting a

3  personal interest, financial or otherwise, into the enforcement

4  process may bring irrelevant or impermissible factors into the

5  prosecutorial decision and in some contexts raise serious

6  constitutional questions." <u>Marshall</u>, 446 U.S. at 249-50.  Again,

7  however, plaintiffs' reliance on the restrictions placed on

8  prosecutors is misplaced because, while Craighead helped

9  implement a diversion program pursuant to contracts with district

10  attorneys' offices, he did not exercise power akin to

11  prosecutorial discretion.  <u>See</u> <u>Gallego v. McDaniel</u>, 124 F.3d

12  1065, 1079 (9th Cir. 1997) ("In <u>Marshall</u>, the Supreme Court

13  observed that a prosecutor's direct pecuniary interest in the

14  outcome of a case <u>that has an impact on the prosecutor's decision</u>

15  <u>whether or not to enforce a particular statute</u> may have

16  constitutional ramifications.") (emphasis added).

17     Specifically, DATS' automated program established that

18  any discretion remained with the respective district attorney

19  because only the district attorney could decide not to pursue

20  diversion with a particular debtor.  Similarly, only the district

21  attorney could elect to pursue criminal charges if a check writer

22  did not elect to pursue diversion.  If a debtor chose not to

23  pursue diversion, DATS' only option was to refer the check to the

24  district attorney if it satisfied the applicable guidelines or

25  return it to the merchant if it did not.  Under no circumstances

26  did DATS have the discretion or "authority to deprive check

27  writers of their property." <u>Hamilton v. Am. Corrective</u>

28  <u>Counseling Servs., Inc.</u>, No. 3:05-434, 2006 WL 3332828, at *6

1  (N.D. Ind. Nov. 14, 2006).  The line of cases addressing

2  potential due process concerns when a prosecutor has a financial

3  interest, therefore, is also inapplicable to Craighead.

4      Lastly, plaintiffs rely on two state court decisions

5  that held it unconstitutional for a prosecutor to withhold a

6  pretrial diversion program from an <u>indigent</u> defendant solely

7  because the defendant was unable to pay a fee or fine.  <u>Mueller</u>

8  <u>v. State</u>, 837 N.E.2d 198, 205 (Ind. App. 2005); <u>Moody v. State</u>,

9  716 So.2d 562, 565 (Miss. 1998).  The court need not address the

10 merit of those decisions because plaintiffs have neither alleged

11 nor offered evidence showing that any of the plaintiffs were

12 indigent.  <u>See Mueller</u>, 837 N.E.2d at 205 ("It is unclear from

13 the record whether the trial court here made a final

14 determination as to whether [the defendants] were, in fact,

15 indigent with respect to paying the fees, and we remand for

16 consideration of that issue.").

17     Accordingly, because plaintiffs fail to show any facts

18 suggesting that Craighead violated their procedural due process

19 rights, the court must deny their motion for summary judgment

20 with respect to their federal and state constitutional claims.

21     IT IS THEREFORE ORDERED that:

22     (1) plaintiffs' motion for summary judgment with

23 respect to Craighead's violations of §§ 1692e(2)-(5), (9)-

24 (11), (14), 1692f(1), 1692g(a) of the FDCPA be, and the same

25 hereby is, GRANTED;

26     (2) Craighead's motion for summary judgment with

27 respect to his liability under the FDCPA be, and the same

28 hereby is, DENIED;

1          (3)  plaintiffs' motion for summary judgment with

2 respect to statutory and actual damages be, and the same

3 hereby is, DENIED; and

4          (4)  plaintiffs' motion for summary judgment with

5 respect to their claims for violations of federal and state

6 procedural due process be, and the same hereby is, DENIED.

7 DATED:  May 2, 2008

8

9                          _____

10                  WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE